UNITED STATES OF AMERICA, )
      Respondent, )
)
v. ) No. 2:08-CR-07
) No. 2:11-CV-323
)
SAM JERRY STREET, )
      Petitioner. )

## MEMORANDUM OPINION

This matter is before the Court on the "Motion To Vacate, Set Aside, Or Correct A Sentence By A Person In Federal Custody Pursuant to 28 U.S.C. § 2255," [Doc. 145],[1] filed by Sam Jerry Street( "Street" or "petitioner"). Street has also filed a "First Supplement" to his motion, [Doc. 147], and a "Notice of Amendment," [Doc. 149]. The United States has responded in opposition, [Doc. 151], and petitioner has replied, [Doc. 154]. The matter is now ripe for disposition. The Court has determined that the files and records in the case conclusively establish that the petitioner is not entitled to relief under § 2255 and, therefore, no evidentiary hearing is necessary. For the reasons which follow, the petitioner's § 2255 motion lacks merit, and the motion will be DENIED.

## I.     Procedural and Factual Background

A criminal complaint was filed on January 24, 2008, [Doc. 1], charging Street and three co-defendants, his nephew Randall Street ("Randall"), Jose Encarnacion Mirales ("Mirales"), and Rebecca Mayse ("Mayse"), with conspiracy to distribute and possess with the intent to distribute 50 grams or more of methamphetamine in violation of Title 21 United States Code §§ 846 and 841(a)(1). The complaint also charged all four defendants with possession of a firearm

---

[1]   All references are to docket entries in case No. 2:08-CR-07 unless otherwise indicated.

in furtherance of a drug trafficking crime in violation of Title 18 United States Code § 924(c). Street was ordered temporarily detained by the United States Magistrate Judge on the same day, [Doc. 13], and was ordered detained pending trial by order entered on January 28, 2008, after a detention hearing, [Doc. 29]. On February 12, 2007, a federal grand jury returned a seven count indictment charging Street, Randall, Mirales and Mayse in Count One with a conspiracy to distribute and possess with the intent to distribute 50 grams or more of methamphetamine. Street was also charged in Count Three of the indictment with possessing with the intent to distribute 50 grams or more of methamphetamine and in Count Four with possession of a firearm in furtherance of the drug trafficking offenses charged in Counts One and Three of the indictment. Although counsel was initially appointed by the Court to represent Street, retained counsel made an appearance in the case on February 14, 2008, [*see* Docs. 40, 41].

Mirales and Mayse quickly entered into plea agreements with the United States, [Docs. 46, 48]. After some motion litigation, Randall entered into a plea agreement with the United States as well, [Doc. 72]. Street, however, proceeded to trial which commenced on April 30, 2008, Docs. 78, 79, 80]. On May 2, 2008, Street was convicted of Counts One, Three and Four of the indictment, [Doc. 84]. A sentencing hearing was held on October 6, 2008, and Street was sentenced to concurrent sentences of 78 months of imprisonment as to Counts One and Three and a 60 month term or imprisonment as to Count Four, to be served consecutively, for a net effective sentence of 138 months. [See Doc. 112]. Judgment was entered on October 17, 2008, [Doc. 113], and Street's *pro se* notice of appeal was filed on the same day, [Doc. 114]. On July 23, 2010, the United States Court of Appeals for the Sixth Circuit affirmed the District Court's judgment, [Doc. 140; *United States v. Sam J. Street*, 614 F.3d 228 (6th Cir. 2010)], and the instant motion to vacate was timely filed on October 24, 2011, [Doc. 145].

The Sixth Circuit set out the following factual and procedural background in its opinion:

On January 23, 2008, police in Washington County, Tennessee received a tip from an informant that a methamphetamine sale would take place later that day at the Waffle House in Boones Creek, Tennessee. According to the informant, the seller, Randall Street, would arrive at the Waffle House in a black Ford Mustang with low profile tires, tinted windows, a rear spoiler and dealer tags. Randall would be joined by one person, the informant added, and would arrive via Interstate 26.

Later that day, officers on the Interstate saw a Mustang matching the informant's description heading toward Boones Creek. Waiting in a lot adjacent to the Waffle House with several other officers, Sergeant William Gregg saw the black Mustang approach the meeting point and noticed that neither the driver nor the passenger wore a seat belt. See Tenn. Code Ann. § 55-9-603.

When Lieutenant Tom Remine learned about the traffic violation, he stopped the Mustang, and asked the driver, Randall's uncle Sam Street, to exit the vehicle. As Street walked toward the rear of the car, Investigator Sam Phillips saw him "stick his hand in his pocket and grab something." R.67 at 75. Concerned that Street was reaching for a weapon, Phillips grabbed Street's arm and asked "if he had anything in his pocket." R.61 at 9. When Street said he had a pistol, Phillips removed Street's hand from his pocket, reached in and retrieved a .38 snub-nosed revolver. Street admitted he did not have a permit to carry the concealed weapon. See Tenn. Code Ann. §§ 39-17-1307(a)(1), 39-17-1308(a)(2).

Gregg asked Randall to step out of the car, reasoning that "with the driver being armed … the passenger may be armed" as well. R.61 at 10. He frisked Randall for weapons and "felt three bulges in his left coat pocket," which Randall admitted were drugs. R.61 at 11. The bulges turned out to be three silver balloons filled with crystal methamphetamine. The officers arrested Street and Randall. When Street arrived at the detention center, a booking search yielded one more item: a set of digital scales in his jacket pocket.

A federal grand jury indicted Street and Randall, together with two co-conspirators, for conspiring to possess and distribute methamphetamine. See 21 U.S.C. §§ 841(a)(1), 846. It also indicted Street and Randall for possession with the intent to distribute methamphetamine, see 21 U.S.C. § 841(a)(1), and Street

3

for possessing a firearm in furtherance of a drug-trafficking offense, see 18 U.S.C. § 924(c).

Street moved to suppress the evidence obtained from the search in the Waffle House parking lot, arguing that it violated his Fourth Amendment rights. After holding a suppression hearing, the magistrate judge found that "officer safety" concerns justified the search. R.60 at 7. The district court adopted the magistrate's recommendation.

Randall and the two other co-conspirators pled guilty to the indictment and agreed to cooperate with law enforcement, leaving Street to stand trial alone. At trial, Randall pointed the finger at Street, saying that his uncle had asked him to help sell seven ounces of methamphetamine. Although Randall admitted contacting the informant about the sale, it was Street, he testified, who dealt with the suppliers and who set the transaction in motion.

The trial ended at mid-day on May 1, 2008, and the jury deliberated during the afternoon. At the end of the day, the foreman asked the court to allow the jurors to go home for the evening, but also informed the court (for the first time) that one of the jurors would be unavailable the next day. The court asked counsel for input. Street's attorney said he "would prefer to allow that juror to go as opposed to forcing him to come back . . . [a]nd would rather not make them work tonight. . . . I would rather substitute the alternate." R.129 at 81. The government did not object to this suggestion, and the court accepted the proposal, instructing the jurors to "begin [their] deliberations anew" with the new member the next morning. R.130 at 3. On May 2, 2008, after about three hours of deliberation, the jury returned a guilty verdict on all three counts. The court sentenced Street to a 138-month prison term. He appeals.

[Doc. 140 at 2-3]. Other facts, as relevant to the issues raised in this § 2255 motion, will be discussed throughout the Court's memorandum opinion.

## II.    Standard of Review

This Court must vacate and set aside petitioner's sentence if it finds that "the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the

4

constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, . . ."
28 U.S.C. § 2255. Under Rule 4 of the Governing Rules, the Court is to consider initially
whether the face of the motion itself, together with the annexed exhibits and prior proceedings in
the case, reveal the movant is not entitled to relief. If it plainly appears the movant is not entitled
to relief, the court may summarily dismiss the § 2255 motion under Rule 4.

When a defendant files a § 2255 motion, he must set forth facts which entitle him to
relief. *Green v. Wingo*, 454 F.2d 52, 53 (6th Cir. 1972); *O'Malley v. United States,* 285 F.2d 733,
735 (6th Cir. 1961). "Conclusions, not substantiated by allegations of fact with some probability
of verity, are not sufficient to warrant a hearing." *O'Malley*, 285 F.2d at 735 (citations omitted).
A motion that merely states general conclusions of law without substantiating allegations with
facts is without legal merit. *Loum v. Underwood*, 262 F.2d 866, 867 (6th Cir. 1959); *United
States v. Johnson*, 940 F. Supp. 167, 171 (W.D. Tenn. 1996). To warrant relief under 28 U.S.C.
§ 2255 because of constitutional error, the error must be one of constitutional magnitude which
had a substantial and injurious effect or influence on the proceedings. *Brecht v. Abrahamson*,
507 U.S. 619, 637 (1993) (citation omitted) (§ 2254 case); *Clemmons v. Sowders*, 34 F. 3d 352,
354 (6th Cir. 1994). *See also United States v. Cappas*, 29 F.3d 1187, 1193 (7th Cir. 1994)
(applying *Brecht* to a § 2255 motion). If the sentencing court lacked jurisdiction, then the
conviction is void and must be set aside. *Williams v. United States*, 582 F. 2d 1039, 1041 (6th
Cir.), *cert. denied*, 439 U.S. 988 (1978). To warrant relief for a non-constitutional error,
petitioner must show a fundamental defect in the proceeding that resulted in a complete
miscarriage of justice or an egregious error inconsistent with the rudimentary demands of fair
procedure. *Reed v. Farley*, 512 U.S. 339, 354 (1994); *Grant v. United States*, 72 F. 3d 503, 506
(6th Cir.), *cert. denied*, 517 U.S. 1200 (1996). In order to obtain collateral relief under § 2255, a

petitioner must clear a significantly higher hurdle than would exist on direct appeal. *United States v. Frady*, 456 U.S. 152 (1982).

The Sixth Amendment provides, in pertinent part, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. A defendant has a Sixth Amendment right not just to counsel, but to "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In *Strickland*, the Supreme Court set forth a two-pronged test for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland* 466 U.S. at 687. As with any other claim under § 2255, the burden of proving ineffective assistance of counsel is on the petitioner. *Virgin Islands v. Nicholas*, 759 F. 2d 1073, 1081 (3rd Cir. 1985).

In considering the first prong of the test set forth in *Strickland*, the appropriate measure of attorney performance is "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. A defendant asserting a claim of ineffective assistance of counsel must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. The evaluation of the objective reasonableness of counsel's performance must be made "from counsel's perspective at the time of the alleged error and in

light of all the circumstances, and the standard of review is highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986).

The second prong of the *Strickland* test requires the petitioner show counsel's deficient performance prejudiced the defense. Thus, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. The petitioner must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. The *Strickland* Court emphasized both prongs must be established in order to meet the claimant's burden, and if either prong is not satisfied the claim must be rejected, stating:

> Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result.

*Id.* at 697.

## III. Analysis and Discussion

Petitioner raises four claims of ineffective assistance of counsel in his motion, which he states as follows:

> (1)      Trial Counsel rendered ineffective assistance of counsel in the investigation, examination and argument on key Government witness Randall Street;

> (2)      Trial Counsel rendered ineffective assistance of counsel in investigating and presenting evidence related to Defendant's habits and conduct of business;

(3)     Trial Counsel rendered ineffective assistance of counsel in cross-examining key Government witnesses Rebecca Mayse and Randall Street, and in arguing the inconsistences of their testimony to the jury; and

(4)     Trial Counsel rendered ineffective assistance of counsel by failing to timely raise motions pursuant to F.R. Crim. P. 29(a), thus preserving Defendant's right to challenge the sufficiency of the evidence on Count 4.

The Court will address each of these grounds in turn.

A.     **Ground One**

Street argues that the government's case against him "hinged" on the testimony of his nephew, Randall, and it is undeniable that Randall's testimony was crucial evidence against Street. Street claims that counsel was "provided with all the tools he needed" to prove Randall's testimony was false. Street claims counsel was ineffective in "investigat[ing], examin[ing] and argu[ing]" the evidence. Street points to three specific "tools."

First, he points to DEA laboratory reports on the analysis of the methamphetamine seized on January 23 from Randall's pocket and truck and from the house of Mayse and Mirales. The methamphetamine hydrochloride seized from Randall at the Waffle House on January 23 had a purity of 14.5 percent (+/- 0.9%); the methamphetamine hydrochloride recovered from Randall's truck at the Doe River Trading Post had a purity 14.9 percent (+/- 0.9%). This, Street argues, suggests that both came from "the same batch of lousy methamphetamine." The drugs seized from Mayes and Mirales were identified as methamphetamine, salt form undetermined,[2] and the purity was likewise not determined. This, Street further argues, establishes that the methamphetamine Randall possessed "did not even <u>match</u> the methamphetamine that Mirales

---

[2]     Street asserts in his memorandum that "the type of methamphetamine salt . . . could not even be determined;" however, that is not what the laboratory report indicates. The report simply indicates "salt form undetermined" but does not reflect whether testing to determine the type of salt was actually done. The report likewise does not indicate whether any analysis was done to determine the purity of the methamphetamine.

and Mayse had," undermining Randall's testimony that Street had gotten it from Mayse and Mirales.

The precise nature of Street's claim with respect to the laboratory reports is difficult to discern. He appears to argue that the laboratory reports would have shown that Randall's testimony about having obtained the methamphetamine from Mayse and Mirales was "transpicuously false." The reports, however, prove nothing of the sort. The differences identified by Street between the reports concerning the methamphetamine seized from Randall's coat pocket and truck and that seized from Mayse and Mirales have to do with purity of the methamphetamine and the type of the methamphetamine salt. The reports are not inconsistent. The purity of the methamphetamine and the type of methamphetamine salt were both "undetermined" with respect to the Mayse/Mirales sample. This falls far short of establishing that the "Randall Street batch did not even <u>match</u> the methamphetamine that Mirales and Mayse had." Street has not shown any ineffective assistance of counsel related to counsel's "investigation, examination, and argument" as to the laboratory reports. In fact, it appears that Street acknowledges as much when he argues that "[t]his becomes significant when it is considered with the other facts that defense counsel possessed," that being the second and third "tools" possessed by counsel.

Street next faults trial counsel's failure to offer evidence of and/or cross-examination of Randall about "the death of his father about a decade before this case," an event Street claims Randall was "morally-if not legally-responsible for." According to Street's affidavit, Randall sold some "low purity" methamphetamine to a Maryland man around 1998. The man appeared at Randall's house "to get his money back," an argument ensued, shots were fired, and Randall's father was struck and later died. The Maryland man was sentenced to prison for the shooting.

As an initial matter, evidence of Randall's "moral" responsibility for his father's death was inadmissible. Federal Rule of Evidence 608 provides that "specific incidences of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness, . . . may not be proved by extrinsic evidence." Fed. R. Evid. 608. This evidence falls squarely within the Rule's prohibition.

In his reply, Street argues that Rule 608 does not apply to evidence of the death of Randall's father "but rather [that the evidence would go] to his rather distinctive <u>modus operandi</u>, trying to sell low-quality methamphetamine he had manufactured." [Doc. 154]. Street's reply misses the point. To the extent any evidence of the events of 1998 are admissible, "[i]t was not that Randall had sold meth before, or even that his misadventures contributed to the death of his dad . . . . it was the <u>modus operandi</u> again, Randall peddling lousy meth, that was relevant under F.R. Ev. [sic] 404(b)." [*Id*. at 4]. The Court will therefore focus on the question of whether Randall's sale of "lousy meth" in 1998 was relevant as evidence of ***modus operandi***.

Street argues that evidence of Randall's prior 1998 sale of poor-quality methamphetamine was relevant and should have been used by trial counsel to show Randall's *modus operandi* for "peddling lousy meth." Street argues that evidence of the prior sale "would have raised a reasonable belief in the jury's mind that Randall—an old hand at making and selling bad meth—had cooked up the bad meth in his possession and that he was trying to sell it. The meth did not belong to Mirales or Mayse at all, which meant that the rest of the story about Defendant cooperating with Randall to sell the Mirales-Mayse meth was false, too."

Evidence of a defendant's prior bad acts may be admissible under Rule 404(b) of the Federal Rules of Evidence for many legitimate purposes, one of which is identity. The identity of a perpetrator of a particular crime may be proved by evidence of a similar criminal *modus*

*operandi* utilized in the past by the accused, thus tending to prove that the same actor committed both crimes. *United States v. Fountain*, 2 F.3d 656, 658 (6th Cir.), *cert. denied*, 510 U.S. 1014 (1993). To qualify as *modus operandi* evidence, the similarity between the prior crime and the current offense must be striking, and the method must amount to a "signature." *United States v. Perry*, 438 F.3d 642, 648 (6th Cir.), *cert. denied*, 547 U.S. 1139 (2006). However, "it is not necessary . . . that the crimes be identical in every detail." *Id.* (internal quotations, alterations, and citations omitted).

This claim by Street has several flaws. First, it is unclear how Street would have proven the 1998 sale of methamphetamine by Randall. He offers his own affidavit which asserts that "[i]n about 1998, [Randall] sold a Maryland man some meth that suffered from very low purity." Such testimony by Street would almost certainly be hearsay. If not, that is, if Street had personal knowledge of the 1998 sale and observed or participated in the transaction, it is beyond question why counsel would not introduce the testimony. Second, a vague allegation that Randall sold methamphetamine which was of low purity about ten years before the 2008 offense hardly establishes a similarity that rises to the level of something so "unusual or distinctive" as to constitute a signature. Finally, identity was not an issue here. Street's attempt to admit evidence that Randall sold low quality methamphetamine around 1998 is not offered to prove Randall's identity as the person who committed an offense in 2008; that was admitted. Rather, it is simply a suggestion that Randall sold methamphetamine before in 1998 and therefore he did it again in 2008. Two isolated sales of methamphetamine ten years apart, even if the methamphetamine on both occasions was low purity, does not establish a *modus operandi*. Street offers the evidence only to prove propensity: "Randall did it before, and likely he did it here again." Such evidence is not admissible.

Third, Street faults counsel for not properly investigating and presenting evidence that Randall had been involved in manufacturing methamphetamine during the summer of 2007, contrary to his testimony at trial that "he hadn't been involved in illegal drug activity for the past two years . . ." Street does not offer the affidavit of any witness who could have testified to this based on personal knowledge. Instead, Street relies on his own affidavit. In that affidavit, Street claims that he sold a commercial building in a rural area near Roan Mountain to Randall in January, 2007. Randall did not make the payments due to Street, and Street was required to re-enter the premises after about six months. The building had been severely damaged. While Street was "clean[ing] up the mess," neighbors approached and reported that "the air being blown out of the building had reeked of chemicals." Street does not affirm that he personally smelled chemicals or that he found a laboratory or any by-products of methamphetamine production in the building. He does not identify any of the neighbors by name and he does not provide an affidavit from any witness which outlines the witness' testimony or that he was willing to testify.

Street does claim that "Eric Street confessed to [him] later that he and Randall had been making methamphetamine in the [Roan Mountain] building." Street's testimony about Eric Street's confession is inadmissible hearsay and there is no indication that Eric Street would testify to such activities, thereby incriminating himself in the manufacture of methamphetamine. Street also claims that after Randall was "thrown out" of the Roan Mountain building "he tried to make meth in his own garage. He was not successful, and it burned down instead." Once again, nothing in the record indicates that Street has personal knowledge of this activity and he does not identify any person who could testify that Randall attempted to manufacture

methamphetamine in his garage. In short, Street has not proven that counsel was ineffective as alleged in the motion.[3]

## B. Ground Two

Street next argues that counsel was ineffective because he failed to interview witnesses and present evidence of Street's "habits" related to his carrying of a revolver and a set of digital scales at the time of his arrest, evidence that was very damaging to Street at trial.[4] Street faults counsel for failing to present evidence that would provide a rational explanation for the revolver

---

[3] Within the body of petitioner's argument on Ground One in his memorandum, he appears to raise an additional claim that trial counsel failed to object to the prosecutor's misconduct in misstating the testimony during her closing argument. [*See* Doc. 146 at 22]. "A failure to object to a prosecutor's comments . . . does not fall below an objective standard of reasonableness unless the comments constituted prosecutorial misconduct." *Reed v. United States*, 133 Fed. App'x. 204, 2005 WL 1312270 (6th Cir. May 13, 2005) (citations omitted). Street argues that the prosecutor misstated Randall Street's testimony during her closing argument when she "told the jury that Randall Street had testified that the four-wheeler was <u>not</u> for sale. [Doc. 146 at 22] (emphasis in original).

Randall did testify that he had a four-wheeler at Street's business which was for sale and that Mayse and Mirales wanted the four-wheeler. [Doc. 137 at 72]. And, the Assistant United States Attorney did misstate the testimony during her closing argument when she stated:

> It's not about a four wheeler. No one testified, except for the defendant, that there was a four wheeler that everyone was interested in either buying or selling. Randall Street said he wasn't interested in selling it and Rebecca Mayse said they weren't really interested in buying it, but the defendant kept talking about it.

[Doc. 129 at 46]. That, however, is the extent of the argument made by the government.

Before Street can establish ineffective assistance of counsel on this claim, he must show that the prosecutor's statements were improper and that he was prejudiced by the failure to object. The Sixth Circuit standard for determining whether a misstatement in closing argument constitutes prosecutorial misconduct was set out in *United States v. Carroll*, 26 F.3d 1380 (6th Cir. 1992), holding that a court should first examine whether the prosecutor's remarks were improper, and then apply a four-step test to determine whether the remarks were flagrant. The flagrancy test considers the following factors: 1) whether the remarks tended to mislead the jury or prejudice the accused; 2) whether they were isolated or extensive; 3) whether the remarks were deliberate or accidentally placed before the jury; and 4) the strength of evidence against the accused.

The prosecutor's statement was technically improper because it misstated Randall's testimony. The comments, however, were not flagrant and it was an isolated remark. Nothing suggests that the misstatement was deliberate or that it prejudiced the defendant. The issue of the four-wheeler was insignificant given the proof against the defendant . Furthermore, the jury was instructed both before and after the closing arguments that argument is not evidence and if the lawyers "misstated the facts," then what the lawyers say should be disregarded. The jury was likewise reminded that they, and they alone, were the judges of the facts. Under these circumstances, Street can show neither unreasonable performance or prejudice.

[4] Street refers to the evidence of his possession of a handgun and scales as "[t]he most problematic physical evidence Defendant faced."

and set of scales on his person at the time of the planned drug sale. More specifically, Street claims that he provided counsel with the names of several people—Randy Miller, Terry Buckles, Stacy Street, Kenny Johnson, Jack Johnson[5] , Allen Henson and Rudolph Campbell—who "would have testified to Defendant's habits regarding the gun and the scales." Street has submitted a declaration from each of these witnesses.[6]

In each of the declarations, the declarant avers that he was never contacted and interviewed by counsel. The declarations generally aver that the witnesses would have testified to the following: (1) Opinions that Street "is not a drug dealer," and that the declarant had never seen Street with or using drugs, known him to deal drugs, or heard him talk about drugs; (2) that the declarants knew that Street carried a handgun, that his business had been broken into and that vehicles on his lot had been vandalized, and that he carried the handgun because of the break-ins and vandalism or for protection because he often carried cash for purchasing gold and silver; and (3) that Street bought and sold jewelry and gold and carried a set of scales in his pocket that he used to weigh jewelry and gold and that the declarant had never seen Street use the scales to weigh anything else. These witnesses were friends, relatives, and business associates of Street.

Petitioner argues that the failure of counsel to interview these witnesses was objectively unreasonable, citing *English v. Romanowski*, 602 F.3d 714, 726 (6th Cir. 2010). The United States attempts to distinguish *English* and argues that (1) counsel did, in fact, present evidence of Street's "habits" through testimony by Street himself and another witness, Eric Street, suggesting that the additional evidence would have been cumulative, and (2) that the decision whether to call additional witnesses was a largely unassailable decision. Street replies that the government's

---

[5]    Street submitted unsigned affidavits from both Kenny Johnson and Jack Johnson with his motion. He later supplemented his motion and disavowed reliance on these individuals. [Doc. 149-2].
[6]    The "declaration" of Randy Miller actually consists of handwritten answers to questions posed by Street in a letter to Miller. [Doc. 146-1].

14

reading of *English* is too narrow and that the evidence from these witnesses was not cumulative simply because it corroborated Street's own testimony and that of Eric Street. He argues that the testimony would have "critically added to the strength of Defendant's case." (quoting *English*, 602 F.3d at 727).

The argument between the parties about the specific holding in the Sixth Circuit's *English* decision is largely irrelevant to the Court's decision in this case. The Court will assume for the purpose of deciding this matter that counsel's failure to even interview the potential witnesses identified by Street was in fact ineffective assistance of counsel and will instead focus on the issue of whether or not Street can show any prejudice as a result of counsel's failure.

### 1.  Lay Opinion

Rule 701 provides that a lay witness may testify in the form of opinions or inferences only if those opinions or inferences are "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact at issue." Fed. R. Evid. 701. However, testimony "offering nothing more than a legal conclusion-i.e., testimony that does little more than tell the jury what result to reach-is properly excludible under the Rules." *Woods v. Lecureux*, 110 F.3d 1215, 1219 (6th Cir. 1997). Opinion testimony by a lay witness that Street "is not a drug dealer" falls in his latter category and would have been inadmissible at trial. Street therefore suffered no prejudice from counsel's failure to interview and present this testimony from Randy Miller at trial.

### 2.  Proof that witness had never seen Street possess or use drugs, known him to deal drugs or talk about drugs, or use scales for weighing anything except gold and silver

Rule 401 provides:

Evidence is relevant if:

(a) it has any tendency to make a fact more or less probable
that it would be without the evidence; and

(b) the fact is of consequence in determining the action.

Fed. R. Evid. 401.  Under Rule 402, all relevant evidence is admissible and irrelevant evidence is

not admissible.  Fed. R. Evid. 402.

The proffered evidence is not relevant here because it does not tend to

prove that Street was not engaged in a conspiracy with Randall on or about January 23.  In fact,

drug dealers generally carry on their illegal activities in secret and do not possess or deal drugs in

the public view; nor is it usual for a drug dealer to talk to third parties about his illegal activities.

Evidence that a witness had never, in the past, seen Street use or possess drugs, known of him to

deal drugs or talk about drugs, or seen him use scales to weigh anything other than gold or silver,

has no probative value on the ultimate question of whether Street was engaged in a conspiracy in

January, 2008.   Even if the testimony had some slight probative value, that value is far

outweighed by the dangers of unfair prejudice, confusion of the issues, and misleading the jury,

and would be inadmissible on that basis.  *See* Fed. R. Evid. 403 and discussion below in § III. B.

3.

### 3.      Evidence of "Habit"

Street claims counsel should have presented evidence from his friends and

associates of his "habit" of carrying a firearm for protection because he often carried gold and

silver on his person and because his business had been broken into and vandalized, and that he

carried scales because he bought gold and silver and used the scales to weigh his purchases and

sales.

Federal Rule of Evidence 406 provides that:

Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with a habit or routine practice

Fed. R. Evid. 406. As noted in the Advisory Committee comment, habit "describes one's regular response to a repeated specific situation." "Before a court may admit evidence of habit, the offering party must establish the degree of specificity and frequency of uniform response that ensures more than a mere 'tendency' to act in a given manner, but rather, conduct that is 'semi-automatic' in nature." *Thompson v. Boggs*, 33 F.3d 847, 854 (7th Cir. 1994) (quoting *Simplex, Inc. v. Diversified Energy Systems, Inc.*, 847 F.2d 1290, 1293 (7th Cir. 1998)); *see also Bowman v. Corrections Corporation of America*, 350 F.3d 537, 549 (6th Cir. 2003).

A party offering evidence of habit must demonstrate a regular practice of meeting a particular type of situation with a specific type of conduct. *Jones v. Southern Pacific Railroad*, 962 F.2d 447, 449-50 (5th Cir. 1992). "[H]abit or pattern of conduct is never to be lightly established, and evidence of example, for purpose of establishing such habit, is to be carefully scrutinized before admission." *Loughan v. Firestone Tire & Rubber Company*, 749 F.2d 1519, 1524 (11th Cir. 1985) (quoting *Wilson v. Volkswagen of America*, Inc., 561 F.2d 494, 511 (4th Cir. 1977)). Courts are to be cautious in admitting such evidence "because it necessarily engenders the very real possibility that evidence will be used to establish a party's propensity to act in conformity with its general character, thereby thwarting Rule 404's prohibition against the use of character evidence . . ." *Simplex*, 847 F.2d at 1293.

Street cannot show prejudice here for several reasons. First, habit evidence under Rule 406 is admissible to prove ***conduct*** in conformity with a habit. What Street really seeks to prove by the offered evidence is not his conduct on a particular occasion but his

___*reason*___ for the conduct.  His conduct on the occasion of his arrest, that is, the possession of a firearm and digital scales, is not really at issue in the case.  The proof that he possessed those items is undisputed.  Additional evidence of his conduct--his habit--of carrying a firearm and digital scales was wholly unnecessary.  Instead, Street seeks to prove that, because he carried a firearm to protect himself, the gold and silver purchased, or money associated with the sale and purchase of gold and silver on prior occasions,[7] he carried it solely for that purpose on January 23.  This is not "habit" evidence within the scope of Rule 406.

Second, the evidence is not the type of evidence contemplated by Rule 406 because it does not establish a "regular response to a repeated specific situation," *see* Fed. R. Evid. 406, Adv. Com. comment, *supra*; *Eaves v. United States*, No. 4:07-CV-118-M, 2009 WL 3754176, at * 7 (W.D. KY Nov. 5, 2009) (citations omitted); *Houchins v. Jefferson County Bd. of Edu.*, No. 3:10-CV-147, 2013 WL 811723, at * 1 (E.D. Tenn. March 5, 2013), but rather is evidence as might suggest a "tendency to act in a particular manner."  *Thompson*, 33 F.3d at 854 (internal quotations and citation omitted).

The proposed testimony here is instead governed by Rule 404(b) which provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show conformity therewith."  Fed. R. Evid. 404(b)  Street offers the evidence at issue here to do exactly what 404(b) forbids:  Proving that, because he carried a firearm and scales on other occasions, even numerous occasions, for purposes unrelated to drug trafficking, his purpose on January 23 must also have been related to non-drug trafficking purposes.  Petitioner's claim fails for this reason also.

---

[7]   The Court notes that most of the testimony Street offers from his witnesses as to his reasons for carrying the firearm and scales is not based on personal knowledge but rather would be inadmissible hearsay.

Even if the proffered evidence were admissible under Rules 404(b) or 406, there are other reasons why the testimony offered by Street's friends and associates was inadmissible. As noted in the prior section, only relevant evidence may be admitted at trial. Fed. R. Evid. 402. To be admissible, the evidence must be relevant to some issue of "fact that is of consequence to the determination of the action." Fed. R. Evid. 401. Although some evidence of the reason Street routinely carried a firearm and scales for other purposes was admitted at trial without objection from the government, the evidence does not tend to prove what was of consequence with respect to the jury's consideration of whether Street possessed the firearm on January 23 in furtherance of the drug trafficking offense or whether the scales, clearly a tool of the drug trade, were possessed to facilitate drug trafficking. In other words, proof that Street customarily or routinely carried a firearm and scales for other purposes does not ***disprove*** that he carried the firearm and scales on January 23 to facilitate the sale of drugs.

There was no evidence, and none is offered now, that Street needed the firearm for personal protection on January 23 because he was carrying gold and silver, and he was not in possession of cash that would indicate he might purchase gold and silver that day on his trip with Randall to the Waffle House. Furthermore, Street does not explain how his possession of a firearm due to break-ins and vandalism at his business relates to the carrying of a firearm on the day in question at a location far removed from his place of business. Likewise, evidence that the scales were used by Street to weigh gold and silver does not exclude the possibility that they were also used to weigh drugs, notwithstanding that the scales apparently contained no cocaine residue when seized.[8] In short, the proffered evidence was not relevant.

---

[8] The Court also notes that the drugs in Randall's possession on January 23 were contained in balloons. The scales could have easily have been used to weigh the drugs and packaging together and no residue would necessarily have been left behind on the scales. In addition, the scales could have been used at the time of the aborted sale to assure the purchaser of the weight purchased.

Finally, Federal Rule of Evidence 403 permits relevant evidence to be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." Fed. R. Evid. 403. "It is well settled that a trial judge's discretion in balancing the probative value of evidence against its potential for unfair prejudice [,confusion of the issues, or misleading the jury], is very broad." *United States v. Bilderbeck*, 163 F.3d 971, 978 (6th Cir. 1999). Here, even giving the proffered evidence its "maximum reasonable probative force", *see Laney v. Cellotex Corp.*, 901 F.2d 1319, 1320-21 (6th Cir. 1990) (citations omitted), the evidence had the clear potential for confusing the issues before the jury, leading to an "unfair inference" not based on actual evidence. *See United States v. Lucas*, 357 F.3d 599, 606 (6th Cir. 2004).

For the foregoing reasons, petitioner's arguments in support of his Ground Two lack merit.

## C.     Ground Three

In this ground, Street claims that counsel's cross-examination of Randall and Mayse was ineffective. He claims counsel never asked Randall about "his father's death and the lousy drugs that led to the altercation that killed him," "never confronted him on his methamphetamine-manufacturing operation that prior summer . . . or the mishap at his own garage," "never confronted Randall Street about defendant having given him the prepaid cell phone in exchange for the new LG phone that Randall had owned until his cell phone service was cut off for non-payment," and failed to ask questions to highlight the inconsistencies between Randall's and Mayse's testimony.

These inconsistencies, according to Street, are listed in paragraph 36, page 24, of Street's memorandum, [Doc. 146]:

- Randall said Defendant had Mirales and Mayse methamphetamine in late December or early January, but Rebecca said no methamphetamine was provided until January 22.

- Rebecca said that Randall and Defendant were interested in cocaine when she first met Randall. Randall said nothing about cocaine, but said when he first met Mirales and Mayse in mid-January, he showed them how poor their methamphetamine was by melting it.

- Rebecca never said anything about the poor quality methamphetamine, or about Randall's story that he and Defendant had to beat down Mirales and Mayse on the price. Instead, she said that when the meth was first brought to them on January 22, Defendant and Randall readily agreed that they could sell it the next day, and that Jose Mirales set the price.

- Randall said that the four-wheeler was for sale, and that Mirales and Mayse were interested in buying it. Rebecca Mayse said that she and her husband were not interested, and that Randall tried to swap it to them for cocaine.

- Randall described how Defendant had to call Mirales and Mayse repeatedly over a 3-4 hour period on the morning of January 23, 2008, before he could reach Rebecca. Rebecca said Defendant called her before her son's grade school started that morning, and she told him she would be there as soon as she dropped her son off for school.

- Rebecca said that Defendant gave her the cellphone because her husband's phone didn't work well, and Defendant wanted to be able to reach her when they got the money for the meth. But Randall said that Mirales and Mayse had already agreed to a meeting time that evening to pick up the money.

Petitioner likewise contends that counsel's cross-examination of Mayse was "objectively unreasonable." Before cross examining Mayse, Street claims that he urged counsel to obtain records related to Mirales' purchase of a truck from Street around mid-January, 2008, and to cross examine Mayse on the details, as well as details of the discussion with Mayse and Mirales

21

about the possible purchase of a four-wheeler.  The Court will discuss each of these claims in turn.

Petitioner faces an uphill burden here.  "Decisions about whether to engage in cross-examination, and if so to what extent and in what manner, are strategic in nature and generally will not support an ineffective assistance claim."  *Dunham v. Travis*, 313 F.3d 724, 732 (2d Cir. 2002) (internal quotation marks omitted).  *See also United States v. Steele*, 727 F.2d 580, 591 (6th Cir. 1984) (holding that cross-examination "falls within the area of trial tactics and strategy that should not be subjected to second guessing and hindsight" by the court). "Courts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel."  *Henderson v. Norris*, 118 F.3d at 1283, 1287 (8th Cir. 1987).   Where trial counsel "conducts a thorough and meaningful cross-examination of a witness, counsel's failure to employ a trial strategy that, in hindsight, might have been more effective, does not constitute unreasonable performance" for purposes of ineffective assistance of counsel claim.  *Cardwell v. Netherland*, 971 F. Supp. 997, 1109 (E.D. VA 1997).  Impeachment strategy is a matter of trial tactics, and tactical decisions are not ineffective assistance of counsel because in retrospect better tactics might have been available.  *Johnson v. Hofbauer*, 159 F. Supp.2d 582, 607 (E.D. Mich. 2001).

Petitioner first claims that counsel's cross-examination of Randall was ineffective because he failed to cross-examine Randall about his father's death and his methamphetamine manufacturing the previous summer.  The Court has discussed these issues extensively in section III. A. above and sees no reason for repeating that discussion here.  Suffice it to say, counsel's cross-examination of Randall was not ineffective for the reasons set forth in that section.

Petitioner next claims that counsel was ineffective in his cross-examination of Randall because he never "confronted" Randall about the circumstances related to the prepaid cellphone provided to Mayse. Here, some further recitation of the facts is necessary. Randall testified at trial that Mirales and Mayse agreed to front methamphetamine, allow him and Street to complete the transaction with the confidential informant in Boones Creek, and then return to Street's business, Doe River Trading Post, to deliver the money. According to Randall, Street provided Mayse and Mirales with a prepaid cellphone so they "could stay in contact because he was having a hard time keeping in contact with them on their phone." [Doc. 137 at 65]. Randall made contact with Mayse later in the day of January 23 after the arrest. Mayse called several times on the phone and, after Randall was "connected with a wire," Randall made arrangements to meet with her and Mirales later in the evening to drop off the money. [*Id*. at 65-6]. Mayse likewise testified that she received a cellphone from Street because Street and Randall had had trouble making incoming calls to Mirales's cellphone "and wanted to make sure they could get in touch with [them] once they got back with the money." [*Id*. at 102]. Mayes confirmed that she used the phone later in the day to contact Randall to set up the meeting that led to her arrest. [*Id*. at 103]. The cellphone was in Mayse's possession when she was arrested.

Street claims in his declaration that he owned two cellphones; his regular one had developed a defect. He had purchased the prepaid cellphone in order to keep in contact with a client. Meanwhile, Randall's cellphone account had been closed for non-payment. Randall had a "nice LG phone" and Street bought it from him and gave him the prepaid cellphone with about $30.00 on the prepaid credit in partial payment. Street then began transferring all his numbers to the new phone. According to Street, he had no idea Randall had given the prepaid phone to Mayse and Mirales. Street states that he "wanted my attorney to look at the phone records from

my phones, both the landline at the Doe River Trading Post and the cellphones, which would have established that my calls to Mayse and Mirales were few and sporadic, and related to having sold them the truck and having them speak to Randall about the 4-wheeler." [Doc. 146-1 at ¶ 16].

Street's claims seem to be both a failure to investigate claim and a claim of ineffective cross-examination. The problem with the failure to investigate claim, however, is that Street can show no prejudice. He has not produced the phone records and makes no real effort to show how these records could possibly have shown the subject matter of Street's phone calls with Mayse and Mirales, nor how the records "would have corroborated Defendant's explanation as to how the prepaid cellphone fell into Randall's hands, not Rebecca Mayse's hands." [Doc. 154 at ¶ 23]. With respect to Street's claim that counsel's cross-examination was inadequate, he cannot show how the phone records could have been used to impeach Randall or Mayse about their version of what happened with the cellphone. Under the circumstances, it appears to have been a reasonable strategy to refrain from cross-examination about the cellphone rather than to call further attention to the issue through cross-examination without a clear purpose.

Street next turns his attention to failure of trial counsel to cross-examine about alleged inconsistencies between Randall's and Mayse's testimony. He first complains about a failure to cross-examine about Randall's testimony that he first met Mirales and Mayse in mid-January in the presence of Street, explaining how their methamphetamine was low quality, "even proving it to them by melting it." [Doc. 146-1 at ¶ 28]. He claims Mayse's testimony was different and that she said they supplied no methamphetamine until January 22 and Street and Randall were satisfied with the methamphetamine and could find a buyer. Randall did testify about a call from Street in late December or early January seeking his help in getting rid of about seven ounces of

methamphetamine. Randall then sold all but two ounces. The methamphetamine was poor quality and Randall "understood" that the methamphetamine came from Mirales and Mayse. [Doc. 137 at 57-60]. According to Randall, he met Mirales and Mayse about a week or so later at the Doe River Trading post where Street, Mirales and Mayse were talking about the drugs. Randall "mentioned to [Street] that the quality was poor" and showed them "by breaking it down into liquid form." [*Id*. at 62]. Mayse and Mirales left with the methamphetamine but after Randall and Street talked about it and arranged a sale to Jimmy Rogers, Mayse returned and delivered five and one-half ounces of methamphetamine on the morning of January 23.

Mayse testified that she first met Street about a month before the January 23 events through someone named "Joey" who introduced her and Mirales to Street. The conversation, "at Joey's house," was "about maybe getting some cocaine for Jerry." [*Id*. at 95-96]. Mayse testified that she and Mirales had previously been to Street's business to sell him some cocaine and had taken some methamphetamine to the business on January 22 "to let him look at it." Mayse and Mirales returned home with the methamphetamine after Street and Randall looked at it while the Streets looked for a buyer. The next morning, Mayse was asked to deliver the methamphetamine and Mayse did so after taking her son to school. Mayse also testified she had first met Randall at the time of the cocaine transaction. Randall made no mention of the cocaine. Street also points out that Mayse made no mention of the poor quality of the methamphetamine.

As noted above, Street faults counsel for failing to cross-examine Randall and/or Mayse about what he sees as inconsistencies in their testimony—a "glaring difference in the timelines" and "the lie about the prior dealing of methamphetamine verses sales of cocaine." [Doc. 146 at 24]. The choice by counsel to avoid cross-examination about prior sales of cocaine by Mayse and Mirales to Street can hardly be faulted. Why would counsel highlight before the jury such

damning proof?  Likewise, why would he further highlight the whole episode to point out very minor "inconsistencies" in the testimony?  Counsel's choice to focus his questioning in an effort to call into question the reliability of the testimony of Randall and Mayse generally as witnesses who had something to gain from false testimony because of their hope for a reduced sentence, was quite reasonable, as Street acknowledges.  That he in hindsight might have done so more effectively does not establish ineffective assistance of counsel.  The same is true for the other "inconsistencies" noted by Street.

Counsel's performance, even if it could have been more effective in some instances, did not constitute ineffective assistance of counsel, especially where the record shows that defense counsel carefully cross-examined the prosecution witnesses in an effort to show that Randall was a dishonest drug dealer who was implicating Street for the sole purpose of a reduced prison sentence.  He obtained an admission from Randall that he had a reputation as a "drug dealer and dishonest person" in the Roan Mountain area.  Counsel pursued the same line of questioning with Mayse.  And, counsel pursued the same theme throughout his closing argument.  The strategy employed by counsel was, as the government points out, "a valid and commonly-employed defense strategy" in drug cases where the main government witnesses are cooperating co-conspirators.  The kind of choice made by counsel in cross-examination of witnesses in the present case are similar to the strategic ones made every day by defense counsel.  *See Phoenix v. Matesanz*, 233 F.3d 77, 83 (1ˢᵗ Cir. 2000) (stating that "choices in emphasis during cross-examination are prototypical examples of unchallengeable strategy").  And, even if Street could show deficient performance as required by the first prong of the *Strickland* test, he cannot establish the necessary prejudice required by the second prong.  Not only is there no reasonable probability that the result would have been different if counsel had asked the questions now

urged in hindsight by petitioner, many of the questions related to immaterial inconsistencies are on subjects that detracted from the main cross-examination strategy and would have been counter-productive. Street's claims related to these tactical matters simply do not support a claim of ineffective assistance of counsel.[9]

### D. Ground Four

As the Sixth Circuit found in its decision on Street's direct appeal, trial counsel did not preserve Street's claim as to the sufficiency of the evidence as to Count Four, i.e., that he possessed a firearm in furtherance of a drug trafficking crime, because he failed to renew the Rule 29 motion at the close of all the proof in the case. *Street*, 614 F.3d at 236. Counsel's omission was "nearly fatal to [Street's] sufficiency challenge" as it limited the Circuit's review "to determining whether there was a manifest miscarriage of justice." *Id*. (quoting *United States v. Childs*, 539 F.3d 552, 558 (6th Cir. 2008)). Street argues that there was "no strategic reason" for counsel to fail to make the motion and, had he done so, there is a "reasonable probability that the Rule 29 motion would have been granted, or-on appeal-that the court would have found insufficient proof" that Street was guilty of Count 4 in light of the unchallenged evidence "that he always carried [the firearm]."

The Court will assume that counsel's performance in failing to renew the motion was deficient performance; indeed, it is hard to conceive of any strategic reason for the failure. That, however, addresses only half of the equation. Street must still show a reasonable probability that had counsel renewed the motion for judgment of acquittal as to Count 4, the motion would have been granted on the basis of insufficient evidence. *See United States v. Wagner*, 382 F.3d 598,

---

[9]  Street argues that the case against him was weak, suggesting that the tactics he urges in hindsight are more likely to have made a difference in the outcome of the case. In fact, the opposite may have been true. "Where the prosecutions' case is less than compelling . . . the risk of rocking the boat may warrant a decision by trial counsel to forego the presentation of further defense testimony, even favorable testimony." *Phoenix*, 233 F.3d at 83 (quoting *Lema v. United States*, 989 F.2d 53 (1sr Cir. 1993) (internal quotation marks omitted).

615 (6th Cir. 2004). He cannot do so here. Even applying the general Rule 29 standard, rather than the stricter standard which applied on appeal, "it appears that a rational trier of fact could have found the essential elements of the crime(s) beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 309 (1979).

In addressing sufficiency of the evidence questions, the court does not weigh the evidence, consider the credibility of witnesses, or substitute its judgment for that of the jury. *United States v. Evans*, 883 F.2d 496, 501 (6th Cir. 1989). Instead, the court looks only to whether, after reviewing "the evidence in the light most favorable to the government, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt." *United States v. Beddow*, 957 F.2d 1330, 1334 (6th Cir. 1992) (citing *Jackson*, 443 U.S. at 309). Even "circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not 'remove every reasonable hypothesis except that of guilt.'" *United States v. Ellzey*, 874 F.2d 324, 328 (6th Cir. 1989) (quoting *United States v. Stone*, 748 F.2d 361, 363 (6th Cir. 1984)).

Count 4 charged defendant with an offense under 18 U.S.C. § 924(c)(1)(A) which provides that "any person who, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm" shall be subject to a consecutive term of incarceration. Section 924(c)(1)(A) thus criminalizes two separate and distinct offenses: (1) Using or carrying a firearm during and in relation to a crime of violence or drug trafficking crime; and (2) possessing a firearm in furtherance of any such crime. The proof required for each offense is distinct. *United States v. Combs*, 369 F.3d 925, 933 (6th Cir. 2004).

The "in furtherance of" element of the possession offense requires a higher standard of participation by the defendant than the "during and relation to" element of the use or carry

offense. *United States v. Mackey*, 265 F.3d 457, 461 (6th Cir. 2001). The United States must show that the firearm was possessed to advance or promote the commission of the underlying drug trafficking offense, and that there was "a specific nexus between the gun and the crime charged." *Id*. at 462. The possession charge does not require that the defendant actively employ or physically transport the firearm; rather, it is sufficient if the firearm is strategically located for quick and easy use. *Id.*

There is clearly evidence in the record from which the jury could find that the essential elements of the § 924(c) offense have been proven beyond a reasonable doubt.[10] In fact, even though the Sixth Circuit found that the issue had not been properly preserved and that the stricter standard applied to the sufficiency claim on appeal, the Court appears to have nevertheless found that, even applying the general sufficiency of the evidence standard, there was sufficient evidence of Street's guilt. The Sixth Circuit stated:

> The jury had the following evidence before it: Street was a methamphetamine dealer who asked his nephew to set up a drug sale; he arrived at the sale with an illegally concealed, loaded .38 snub-nosed revolver easily accessible in his pocket; he had a set of digital scales in his pocket—scales often used by drug dealers; his nephew, riding with him in the car, carried several ounces of methamphetamine; and a DEA agent testified that drug dealers often carried guns to protect themselves and their drugs. From all of this, a reasonable jury could conclude that Street carried a firearm to facilitate the drug sale. See Mackey, 265 F.3d at 462.

Street, 614 F.3d at 236.

For this reason, the Court finds Street's Ground Four to be without merit and the claim on this basis is denied.

---

[10] Even though the motion for judgment of acquittal was made at the conclusion of the government's proof, it was presented by counsel only in a perfunctory way with no grounds stated for the motion. When pressed by the Court as to his argument, counsel conceded that the matter was clearly one for the jury, a concession that was required by the government's proof. It is unlikely that such a perfunctory argument made at the conclusion of the government's proof was sufficient to preserve the sufficiency of the evidence question for appellate review even if the Rule 29 motion had been renewed at the conclusion of all the proof in the case.

## IV. Conclusion

For the reasons set forth above, the Court holds petitioner's conviction and sentencing were not in violation of the Constitution or laws of the United States. Accordingly, his motion to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255 will be DENIED and his motion DISMISSED.

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit Court of Appeals disapproves of the issuance of blanket denials of certificates of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). The district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id*. at 467. Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). Id.

A certificate of appealability should issue if petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473 (2000). Having examined each of petitioner's claims under the Slack standard, the Court finds that reasonable jurists could not find that the dismissal of his claims was debatable or wrong. Therefore, the Court will DENY a certificate of appealibility.

A separate judgment will enter.

      ENTER:

s/J. RONNIE GREER
_____
UNITED STATES DISTRICT JUDGE
